IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE NORTHERN TRUST COMPANY and     )
AMERICAN CASUALTY COMPANY OF       )
READING, PENNSYLVANIA,             )
                                   )
                    Plaintiffs,    )   Case No.
         v.                        )
                                   )
KIDDER, PEABODY & CO., INC.,       )
                                   )
                    Defendant.     )

```
FILED: JULY 1, 2008
08CV3765
JUDGE MANNING
MAGISTRATE JUDGE BROWN

TC
```

## COMPLAINT

Plaintiffs, The Northern Trust Company ("Northern Trust") and American Casualty

Company of Reading, Pennsylvania ("American Casualty"), complain of Kidder, Peabody & Co,

Inc. ("Kidder") as follows:

### Nature of Action

1.      This case arises out of securities lending transactions between Northern Trust and

Kidder.

2.      In the lending transactions, Northern Trust, as trustee and lending agent of

corporate pension trusts, loaned shares of securities from those trusts to Kidder in return for

collateral and a relatively nominal fee.  Kidder could then make temporary use of the borrowed

shares for its own customers' accounts, such as by enabling "short" sales.  At the end of the

lending period, Kidder would return the borrowed shares to Northern Trust and Northern Trust

would return Kidder's collateral.

3.      In this arrangement, as a matter of contract and the custom and practice of the

parties and the financial industry, Kidder was obligated to turn over or otherwise compensate

Northern Trust for all economic benefits of ownership associated with the borrowed shares.  For

example, if the issuer of borrowed shares distributed a cash dividend and Kidder or its customer received the dividend because it temporarily held the shares by virtue of the lending arrangement, Kidder was obligated to turn over the dividend to Northern Trust for the benefit of the pension trusts.

4.      Kidder, however, violated that essential feature of the securities lending relationship.  On several occasions, Kidder arranged to borrow shares of a closed-end mutual fund from Northern Trust, as lending agent for the pension trusts.  During the term of those loans, the issuer of those shares declared constructive distributions of long term capital gains.  In connection with those constructive distributions, on behalf of its shareholders, the issuer made actual distributions of cash to the IRS in payment of the estimated taxes due on account of the constructive distributions.  Kidder then wrongfully failed to turn over or otherwise compensate Northern Trust for the amount of those cash distributions.

5.      As a consequence of Kidder's conduct, Northern Trust has been damaged in the amount of approximately $1,763,000, representing the cash amount of the distributions Kidder failed to turn over to Northern Trust for the benefit of the pension trusts.  Northern Trust has been further damaged in the additional amount of at least $2,292,000 in accrued interest, stemming from litigation with the IRS brought about in part by Kidder's failure to ensure that all benefits of ownership were turned over to Northern Trust.

6.      Plaintiffs bring this action to recover those amounts, and to seek other legal relief as appropriate.

7.      The claims against Kidder in this action were originally asserted in a case Northern Trust filed against three brokerage firms that were involved in similar transactions, *Northern Trust, et al. v. Kidder Peabody & Co., et al.*, No. 05-C-3370 (assigned to Judge Zagel).

Because of facts that came to light after the filing of that complaint, Northern Trust voluntarily dismissed Kidder from that case pursuant to Rule 41(a)(1)(A)(i) so that its claims against Kidder could be pursued by separate counsel in a different case, *Northern Trust, et al. v. Kidder, Peabody & Co., Inc.*, No. 05 C 3626 (assigned to Judge Manning). That latter case was dismissed without prejudice pursuant to a tolling agreement between the parties.

### Parties

8.    Plaintiff Northern Trust is an Illinois banking corporation with its principal place of business in Chicago, Illinois. Northern Trust is in the business of financial services. During the relevant period, Northern Trust was the trustee, custodian, and lending agent for two corporate pension trusts (collectively, the "Pension Trusts") and had the authority to loan securities owned by the Pension Trusts. Northern Trust has indemnified the Pension Trusts for their damages as a result of the conduct described herein and is subrogee to the Pension Trusts.

9.    Plaintiff American Casualty is Northern Trust's insurer and partial subrogee. American Casualty is a Pennsylvania corporation with its principal place of business in Chicago, Illinois. American Casualty has paid for all tax liability, interest, and attorneys' fees incurred by Northern Trust in excess of its retention in connection with the IRS lawsuit described below and in connection with the claims asserted herein.

10.    Defendant Kidder is a Delaware corporation with its principal place of business in New York, New York. Kidder is in the business of securities brokerage, sales, and trading.

### Jurisdiction and Venue

11.    Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332. Plaintiffs Northern Trust and American Casualty are diverse from the defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events and conduct giving rise to the claims asserted herein occurred in this District.

**Facts**

**Securities Lending Relationships.**

13.     Securities lending relationships are common in the financial industry.  Financial institutions have routinely established and maintained securities lending relationships for at least the past 20 years.  Well-established industry customs and practices govern the operation of securities lending relationships.

14.     In a securities lending relationship, the lender or lending agent (here, Northern Trust), agrees to lend shares of securities to a borrower (here, Kidder) in return for collateral and a relatively small fee.  The borrower may then use the shares temporarily in connection with its own customers' accounts.  For example, a brokerage could use borrowed shares to enable "short" sales or other trading strategies employed by its customers that require temporary reserves of shares.  At the end of the lending period, the borrower returns the shares or equivalent shares to the lender or its lending agent.

15.     When a lending agent is involved in the transaction, the lending agent contracts directly with the borrower on the lender's behalf and negotiates and effectuates the loan, holds the collateral, collects all benefits owed to the lender, and generally enforces all rights of the lender in the securities lending transaction.

16.     A key feature of securities lending relationships is that the lender retains all of the economic benefits of ownership in the loaned securities throughout the term of the loan.  Under this industry custom and practice, all industry participants understand that the lender is entitled to

all distributions, dividends, interest payments, stock splits, tender offers, and other benefits of

ownership that might arise on or in respect of the borrowed securities during the term of the loan.

If any such benefit happens to be diverted from the lender by virtue of the lending relationship,

the borrower must turn over or otherwise compensate the lender for that benefit.  Were industry

practice otherwise, the small fees charged for securities lending would be substantially higher.

**Northern Trust and Kidder Establish a Securities Lending Relationship.**

17.     Northern Trust and Kidder established a securities lending relationship consistent

with the above-described industry custom and practice in 1981.

18.     Effective September 8, 1981, Northern Trust and Kidder entered into a Broker

Loan Agreement (the "Kidder Agreement").  A true and correct copy of the Kidder Agreement is

attached as Exhibit A.

19.     In entering into the Kidder Agreement, Northern Trust and Kidder contemplated

and agreed that Kidder would turn over or otherwise compensate Northern Trust for all benefits

of ownership arising on or in respect of borrowed shares during the lending period.

20.     Section 5 of the Kidder Agreement provides:

> [Northern Trust] shall be entitled to receive all distributions
> made by the issuers of the Borrowed Securities during the
> term of the Loan, including cash dividends, stock
> dividends, stock splits and interest distributions of any kind
> declared, granted or made by the issuer, or any affiliate
> thereof, and rights to purchase or subscribe for additional
> securities.

(Ex. A at 5.)

21.     After 1981, consistent with the Kidder Agreement and industry custom and

practice, Northern Trust and Kidder participated in a course of dealing involving numerous

individual securities loans in which Kidder turned over to Northern Trust the benefits of ownership of the borrowed shares, except as complained of below.

**Kidder Borrows QFV Shares.**

22.    In the 1990s, Kidder arranged to borrow from Northern Trust shares issued by the Quest for Value Dual Purpose Fund ("QFV").  QFV was a closed-end mutual fund.  Northern Trust, as lending agent, loaned Kidder QFV shares that Northern Trust held in custody for the Pension Trusts ("Borrowed QFV Shares").

23.    Kidder borrowed 900,000 QFV shares from Northern Trust in 1991, 250,000 shares in 1992, and 700,000 shares in 1993.  For each loan, Kidder returned the Borrowed QFV Shares after December 31 of the year in which Kidder borrowed the shares.

24.    Because Kidder held the Borrowed QFV Shares on December 31, the relevant "record date" for tax purposes of the year in which it borrowed the shares, Kidder (or a customer of Kidder) was treated as the formal shareholder of record for the Borrowed QFV Shares at year-end.

**Kidder Wrongfully Fails to Return The Distribution Made in Respect of the QFV Shares**.

25.    In each of the years 1991 through 1995, QFV declared short term and long term capital gains.

26.    With respect to the short term gains, QFV paid its shareholders of record, in cash, short term capital gains distributions in each of the years 1991 through 1995.

27.    Because Kidder (or its customer) was treated as the formal shareholder of record during each year in which Kidder borrowed QFV shares, Kidder (or its customer) received the QFV short term capital gains distribution for the tax year of each respective loan.

28.    Consistent with industry custom and practice and the Kidder Agreement, Kidder was obligated to turn over or otherwise compensate Northern Trust for the cash amount of the QFV short term capital gains distribution, for the benefit of the Pension Trusts.  In each case, Kidder paid the cash amount of those distributions to Northern Trust.

29.    With respect to the long term capital gains in each relevant year, QFV elected to make a constructive distribution pursuant to Section 852(b)(3)(D) of the Internal Revenue Code.

30.    Under the treatment afforded by Section 852(b)(3)(D), for each relevant year, QFV treated the long term capital gain as if QFV had distributed the gain to its shareholders and those shareholders had reinvested the after-tax proceeds of the distribution in QFV.

31.    Specifically, pursuant to Section 852(b)(3)(D), and for each relevant year:

(A)    QFV allocated a pro rata share of the constructive distribution of long term capital gains to each of its shareholders;

(B)    QFV distributed and paid to the IRS, on behalf of each of its shareholders, an estimate of the federal income taxes that would be owed by each shareholder in respect of the long term capital gains, as if QFV had made a cash distribution of those gains;

(C)    As a consequence of the cash distribution paid to the IRS described in step (B) above, the value of the QFV shares was diminished commensurately;

(D)    Each QFV shareholder was required to report to the IRS its share of the constructive distribution as income on its tax returns as if it had received cash dividends;

(E)    Each taxable shareholder was allowed a credit for its share of the income taxes paid by QFV on the shareholder's behalf;

(F)    Any tax-exempt organization holding QFV shares was entitled to a refund for the pro rata share of

federal income taxes paid by QFV on the
shareholder's behalf in step (B), above; and

(G)    The tax basis in each QFV share was increased by
the per-share value of the constructive distribution
less the per-share value of QFV's tax payment, the
resulting amount representing the per-share
constructive reinvestment by each shareholder.

32.    The issuer's actual cash distribution to the IRS on behalf of and for the account of

each of its shareholders as alleged in Paragraph 31(B) above (the "Distribution") constitutes a

distribution within the meaning of Section 5 of the Kidder Agreement.

33.    The Distribution made by QFV conferred a substantial economic benefit since the

Distribution represented a cash payment made on behalf of each QFV shareholder to the IRS.

That payment could be used to reduce tax otherwise owed by each shareholder, or could be the

basis for a request for refund in the event no tax was owed, as in the case of Northern Trust and

the Pension Trusts.  Had Northern Trust and the Pension Trusts been the record shareholders on

December 31 of each relevant year, rather than Kidder (or its customer) as the borrower of the

shares, Northern Trust and the Pension Trusts would have been entitled to tax refunds in the

years 1991 through 1993 totaling approximately $1,763,000.

34.    Each Distribution was a cash distribution out of the assets of the mutual fund and

thus represented a substantial economic benefit of ownership to which Northern Trust, on behalf

of the Pension Trusts, was entitled pursuant to the Kidder Agreement and industry custom and

practice.  Kidder, however, failed to turn over or otherwise compensate Northern Trust for those

cash Distributions.

35.    On information and belief, Kidder and/or its customers instead assumed for itself

or themselves, exclusively, the economic benefits of the QFV Distributions.

36.     As a result, Northern Trust, on behalf of the Pension Trusts, has been denied the cash Distributions and concomitant economic benefits of ownership of the Borrowed QFV Shares, contrary to the terms of the Kidder Agreement, the securities lending relationship, the parties' course of dealing, and industry custom and practice.

37.     During the relevant period, a federal regulation known as "Regulation T" prohibited brokerages like Kidder from borrowing shares for any purpose other than "for the purpose of making delivery of such securities in the case of short sales, failure to receive securities [the broker is] required to deliver, or other similar cases." 12 C.F.R. §220.6(h) (1938-1983), *recodified at* 12 C.F.R. §220.16 (1983-1998).

38.     The parties expressly adopted the provisions of Regulation T in their contract. In the Kidder Agreement, Kidder pledged:

> Each time that securities are loaned under this Agreement,
> [Kidder] represents that (a) the Borrowed Securities will be used
> solely for purposes permitted by Section 6(h) of Regulation T of
> the Board of Governors of the Federal Reserve System . . . .

(Ex. A § 7(a).)

39.     On information and belief, Kidder, in violation of Regulation T, used the Borrowed QFV Shares in illicit tax arbitrage schemes, and not in connection with bona-fide short sales or other permitted transactions.

**Events Prior to Suit.**

40.     Because the Pension Trusts were entitled to the benefit of the QFV Distribution, Northern Trust applied for tax refunds on the Pension Trusts' behalf in connection with each Distribution made by QFV for tax years 1991 through 1995. The refunds related to shares loaned to Kidder and three other brokerages (the "Other Brokerages") under similar lending

agreements. The IRS initially paid the tax refunds to Northern Trust and Northern Trust credited the Pension Trusts accordingly.

41.     However, it appears that Kidder and the Other Brokerages, or customers of Kidder and the Other Brokerages, also applied for tax refunds or credits based upon the cash Distributions to the IRS made by the issuer in connection with the same QFV constructive distributions, without advising Northern Trust that they were doing so.

42.     In 1998, the IRS requested that Northern Trust repay the refunds it received in connection with the QFV shares loaned to Kidder and the Other Brokerages. The IRS soon after commenced lawsuits against Northern Trust in this District, *United States v. Northern Trust Co, as Trustee*, Nos. 98 C 7272 & 98 C 8217 (Moran, J.). The IRS contended that, among other things, Northern Trust was not entitled to apply for the tax refund stemming from QFV's Distributions.

43.     During the pendency of the IRS's suits, Kidder refused Northern Trust's demands for payment of the Distributions.

44.     In 2002, Northern Trust entered into a tolling agreement with Kidder. That agreement and amendments are attached as Exhibit B.

45.     In 2005, Northern Trust settled with the IRS with respect to tax years 1991 through 1994. Northern Trust returned to the IRS the tax refunds that Northern Trust had claimed on behalf of the Pension Trusts for those tax years, including approximately $1,763,000 in connection with the QFV shares borrowed by Kidder. In addition, Northern Trust paid approximately $2,292,000 to the IRS in interest that accrued in connection with the QFV shares borrowed by Kidder. Further, Northern Trust expended more than $600,000 in attorneys' fees in connection with the IRS lawsuits.

**Claim for Breach of Contract**

46.     Northern Trust and Kidder were parties to an enforceable agreement as set out above.

47.     Northern Trust performed all of its obligations under the Kidder Agreement.

48.     Kidder breached the Kidder Agreement and the covenant of good faith and fair dealing by failing to turn over or otherwise compensate Northern Trust for the cash amount of the Distributions, and instead retained the economic benefit of the Distributions exclusively for itself or for its customers.

49.     On information and belief, Kidder also breached the Kidder Agreement and the covenant of good faith and fair dealing by borrowing the QFV shares from Northern Trust for purposes that violated the Permitted Purpose Rule of Regulation T.

50.     Northern Trust has been damaged by Kidder's breach.  Kidder has failed to pay Northern Trust approximately $1,763,000 in Distributions made by the issuer in connection with the Borrowed QFV Shares.

51.     Northern Trust has been additionally and foreseeably damaged by Kidder in the amount of approximately $2,292,000 of interest relating to the Kidder transactions that Northern Trust was required to pay to the IRS and in the amount of its attorneys' fees incurred as a result of the IRS's lawsuit.  If Kidder had turned over the Distributions to Northern Trust, Northern Trust would not have been forced to defend itself in adversarial proceedings against the IRS.

52.     Accordingly, Kidder breached its agreement with Northern Trust and the duty of good faith and fair dealing, and the Court should award plaintiffs the relief prayed for below.

**Prayer For Relief**

WHEREFORE, plaintiffs respectfully request that the Court enter an order for plaintiffs and against Kidder:

    (a)    Declaring that Kidder must return to plaintiffs all economic benefits that arose from the QFV shares;

    (b)    Awarding plaintiffs damages against Kidder in the amount of approximately $1,763,000;

    (c)    Awarding plaintiffs additional damages against Kidder representing plaintiffs' attorneys' fees and interest stemming from the IRS's lawsuit;

    (d)    Awarding prejudgment interest on all amounts owed; and

    (e)    Awarding such additional or different relief as the Court deems necessary and appropriate.

Respectfully submitted,

THE NORTHERN TRUST COMPANY and AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA

By:    /s/ Gerald G. Saltarelli
        One of Their Attorneys

Gerald G. Saltarelli - #2445328
David Winters - #6278729
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street
Suite 1800
Chicago, Illinois 60602-4257
312-444-9660

## BROKER LOAN AGREEMENT

This Agreement is made this ___8th___ day of ___September___, 1981, between THE NORTHERN TRUST COMPANY, as Trustee of various trusts, an Illinois corporation, of Chicago, Illinois, as Lender, and Kidder, Peabody & Co. Inc. a New York Partnership, having an office at ___2 Broadway___, New York, New York ___10004___, as Borrower.

1. **Loan of Securities.** The Lender, in its sole discretion, from time to time may lend securities to the Borrower at the Borrower's request. In the event that the Lender decides to make a loan of securities, it shall promptly deliver to the Borrower on the day of the loan, certificates representing the securities loaned, (herein referred to as "Borrowed Securities") duly executed in blank, and shall submit with the Borrowed Securities a list of the securities on a schedule and receipt. The Borrower shall execute both copies upon receipt of the securities, return the original to the Lender, and retain the duplicate copy. The Lender agrees that it shall submit to the Borrower, on a periodic basis, a list of the securities it has available to loan. The term "Borrowed Securities" wherever it may appear in this Agreement shall be deemed to include (a) the equivalent thereof in the event of



EXHIBIT

A

the reorganization, recapitalization or merger of the issuer of the Borrowed Securities, and (b) all distributions other than cash made to the Borrower by the issuer of Borrowed Securities.

In consideration of all such loans secured by a letter of credit or securities issued or guaranteed by the U. S. Government or its agencies, the Borrower shall pay the Lender a loan premium based on the daily average market value of the aggregate Borrowed Securities from the first business day that the Lender has made delivery of the Borrowed Securities to the Borrower to, but not including, the date that securities identical to the Borrowed Securities are returned to the Lender after termination of the Loan under Sections 3 or 10, or securities identical to the Borrowed Securities are purchased by the Lender as provided in Section 11. In consideration of loans secured by cash, the Lender shall pay to the Borrower a loan rebate fee to be agreed upon by the parties at the time a loan is made and as adjusted during the term of the loan. All accrued loan premiums and loan rebate fees shall be paid by the fifteenth business day of the month.

2. <u>Collateral</u>. Upon receipt of any Borrowed Securities, the Borrower shall simultaneously deliver to the Lender cash, securities issued or guaranteed by the U. S. Government or its agencies, or irrevocable bank letters of credit, or any combination thereof, (herein referred to as the "Collateral") acceptable to the Lender equal to one hundred two percent (102%) of the market value of all Borrowed Securities.

-2-

The market value of both the Collateral and the Borrowed Securities are to be computed on the basis of the price at the close of trading of the securities on the principal exchange on which they are traded on the most recent trading date. In the event the Collateral or the Borrowed Securities are traded other than on a securities exchange, the value will be determined by computing the mean price between the bid and asked prices on the most recent trading day.

The Borrower grants to the Lender a security interest in the Collateral to secure all present and future obligations of the Borrower to the Lender under this Agreement. Such security interest shall survive the termination of any loan under Section 3 or 10 and shall continue until the Collateral is returned to the Borrower. Prior to the maturity of any Collateral, or within 5 business days after the call of any Collateral, the Borrower shall replace such Collateral with other Collateral acceptable to the Lender and of equal market value. The Borrower shall have the right at any other time to substitute other Collateral acceptable to the Lender and of equal market value. Substituted Collateral shall be considered Collateral for all purposes. At or before the time of any substitution, the Borrower shall provide the Lender with a statement of the respective market values of the Collateral to be returned and the Collateral to be substituted. To the extent that any cash or non-cash distributions shall be made on any Collateral, the

-3-

Borrower shall provide the Lender with instructions prior to the distribution date as to the manner in which the distribution shall be paid or delivered to the Borrower.

The Lender's sole obligation to the Borrower in respect to Collateral is to return the Collateral to the Borrower without interest at the termination of the loan. The Collateral shall include any amounts provided for in marking to market adjustments as set forth in Section 8.

3. <u>Termination of the Loan</u>. The Loan may be terminated by the Borrower at any time by delivering to the Lender the Borrowed Securities after notifying the Lender by telephone or in a manner prescribed by Section 12. The loan may be terminated by the Lender at any time, whereupon the Borrower shall deliver securities identical to the Borrowed Securities to the Lender within (a) the customary delivery period for such securities, (b) five business days, or (c) the time negotiated for such delivery by the Lender and the Borrower, whichever is lesser, and the Lender shall concurrently therewith deliver the Collateral to Borrower. If a loan shall not have been sooner terminated by the Lender or the Borrower, it shall automatically terminate on the first anniversary of the Loan.

4. <u>Rights of Borrower in Respect to Borrowed Securities.</u> Until such time as the Loan is terminated under Sections 3 or 10, the Borrower shall have all of the incidents of ownership of the securities including, but not limited to,

-4-

the right to transfer or loan the securities to others;
provided, however, the Borrower shall be obligated to Lender in
respect to all dividends, interest and distribution pertaining
to the securities as set forth in Section 5.  The Lender hereby
waives the right to vote Borrowed Securities during the term of
the Loan.  Despite any termination under Section 3 or 10, any
securities loaned under this Agreement shall continue to be
Borrowed Securities for all other purposes until returned to
the Lender.

     5.  Distributions With Respect to Borrowed
Securities.  The Lender shall be entitled to receive all
distributions made by the issuers of the Borrowed Securities
during the term of the Loan, including cash dividends, stock
dividends, stock splits and interest distributions of any kind
declared, granted or made by the issuer, or any affiliate
thereof, and rights to purchase or subscribe for additional
securities.  Any such distribution by the issuer to the
Borrower shall promptly be delivered to the Lender subject to
the provisions of paragraph (b) of Section 10.

     6.  Rights of Borrower With Respect to Collateral.
During the term of the Loan, the Borrower shall retain
incidents of ownership of the Collateral and the Lender shall
not hypothecate or otherwise encumber the Collateral to others
except as hereinafter provided in Section 11.  Subject to the
Lender's right to invest cash Collateral for its own benefit,
the Lender shall be obligated to the Borrower in respect to all

-5-

dividends, interest and distribution pertaining to the Collateral and the Borrower shall be entitled to receive all distributions made by the issuers during the term of the Loan, including cash dividends, stock dividends, stock splits and interest distributions of any kind declared, granted or made by the issuer, or any affiliate thereof, and rights to purchase or subscribe for additional securities. Any such distribution by the issuer to the Lender shall promptly be delivered to the Borrower. The Borrower hereby waives the right to vote Collateral securities during the term of the Loan.

7. Representations by the Borrower. Each time that securities are loaned under this Agreement, the Borrower represents that (a) the Borrowed Securities will be used solely for purposes permitted by Section 6 (h) of Regulation T of the Board of Governors of the Federal Reserve System, and (b) there has been no material adverse change in the financial condition or net capital ratio of Borrower since the date of the latest statement furnished to the Lender pursuant to Section 9. At the Lender's option, a designation letter may be prepared and forwarded to the Borrower for signature confirming loans made under this Agreement. Such designation letter shall (a) list the additional Borrowed Securities and additional Collateral, if any; (b) compute compliance of the amount of the Collateral with Section 2 upon consummation of the designated loan; (c) set forth (i) the rate of the loan premium or the loan rebate fee, and (ii) any special instructions for delivery, and (d)

-6-

contain representations that (i) the Borrowed Securities will be used solely for purposes permitted by Section 6 (h) of Regulation T of the Board of Governors of the Federal Reserve System, and (ii) there has been no material adverse change in the financial condition or net capital ratio of Borrower since the date of the latest statement furnished to the Lender pursuant to Section 9.

8.  <u>Marking to Market</u>.  In the event the market value of all Borrowed Securities at the close of trading on any business day shall exceed one hundred percent (100%) of the market value of the Collateral, the Lender may, by notice to the Borrower, demand that the Borrower deliver additional Collateral to the Lender, in any amount which, together with the Collateral then held by the Lender, shall equal one hundred two percent (102%) of the market value of the Borrowed Securities at the close of business on that day.

In the event that the market value of all outstanding Borrowed Securities at the close of trading on any business day shall decrease to an amount such that the market value of the Collateral is equal to more than one hundred four percent (104%) of said market value, the Borrower may, by notice to the Lender, demand that the Lender deliver to the Borrower the excess of the Collateral over one hundred four percent (104%) of said market value.

All demands pursuant to this Section 8 shall be complied with not later than the close of business on the day following after which notice is given under this Section.

-7-

9.    <u>Financial Condition</u>.  The Borrower shall promptly deliver to the Lender copies of all statements required to be filed with the Securities and Exchange Commission by Rule 17a-5(c) [17 CFR §240.17a-5(c)] under the Securities Exchange Act of 1934.  The Borrower represents that such statements fairly represent its financial condition and net capital ratio as of the date of the statement.  The Borrower also represents that there has been no material adverse change in its financial condition or net capital ratio since that date.  The Borrower shall also deliver to the Lender its most recent financial information otherwise available to the public and, as long as any loan is outstanding under this Agreement, will promptly deliver to the Lender any such financial information subsequently available.

10.    <u>Termination Upon Default</u>.  All loans made under this Agreement shall terminate upon the happening of any of the following events:

    (a)    if securities identical to Borrowed Securities are not returned to the Lender as provided in Section 3;

    (b)    if the distributions specified in Section 5 are not paid to the Lender promptly and such default is not cured within one business day after notice by the Lender to the Borrower by telephone or as provided in Section 12;

    (c)    if the Borrower shall fail to comply with

-8-

the provisions of Section 8, and such
default is not cured within one business day
after notice by the Lender to the Borrower
by telephone or as provided in Section 12;

(d) if the representations by the Borrower of
its financial condition and net capital
ratio made under Sections 7 and 9 were
incorrect when made;

(e) if the Borrower shall make a general
assignment for the benefit of creditors;
admit in writing its inability to pay its
debts as they become due; file a petition in
bankruptcy or a petition seeking
reorganization, arrangement, composition,
readjustment, liquidation, dissolution of
similar relief under any present or future
bankruptcy, insolvency or similar statute,
law or regulation or seek the appointment of
any Trustee, receiver or liquidator of
Borrower of any material part of its
properties;

(f) if any Federal or state agency or any
creditor of the Borrower other than the
Lender shall file any petition or seek any
appointment specified in subsection (e)
above or under the Securities Investor

-9-

Protection Act with respect to the Borrower, which petition is not vacated within thirty (30) days;

(g)  if the Securities and Exchange Commission shall revoke or suspend the registration of the Borrower as a broker/dealer;

(h)  if any National Securities Exchange or any National Securities Association shall revoke or suspend the membership of the Borrower.

11.  <u>Liquidation For Default</u>.  Upon the happening of any event specified in Section 10, the Lender may immediately elect to purchase securities identical to the Borrowed Securities.  In the event of any such purchase, the Lender may apply the Collateral to the payment of the purchase price including any brokerage expenses, accrued interest and other costs or expenses associated with the purchase by selling a sufficient amount of the Collateral in the principal market for such Collateral, and Borrower shall be entitled to retain a like amount of identical Borrowed Securities.  The Lender may similarly apply the Collateral to any other obligation of Borrower under this Agreement including loan premiums, distributions, and all costs and expenses related to a sale of Collateral; provided however, before the application of any Collateral as provided above, the Borrower shall have an option to deliver a certified or bank cashier's check payable to the Lender in an amount equal to the Borrower's obligations to the

-10-

Lender as a result of the Borrower's default. The Borrower is granted this option for a period not to exceed one (1) business day from the date of the Lender's election to purchase securities as provided above. If any Collateral remains after all obligations of the Borrower under this Agreement have been satisfied, the Lender shall promptly return to the Borrower the balance of the Collateral. If the Collateral is not sufficient to satisfy all obligations of the Borrower, Borrower shall be liable to the Lender for the amount of all remaining obligations plus interest at a rate equal to the Call Money Rate (the charge on loans to brokers on stock exchange collateral) as published in the Midwest Edition of the Wall Street Journal.

12. <u>Notices, Deliveries, Etc.</u> Except as otherwise provided in this Agreement, all notices, deliveries and payments pursuant hereto shall be sufficient if made in writing and delivered by hand, mailed by registered mail or sent by telegram or facsimile transmission to the party or parties entitled to receive such notices at the following address:

To Lender:   The Northern Trust Company

50 South LaSalle Street

Chicago, Illinois 60675

Attn: Securities Lending Administrator

5th Floor

-11-

To Borrower:

or to such other address as either party may furnish to the other party by notice as provided herein.

    13.  <u>The Lender's Authority to Lend</u>.  The Lender represents that it will have the authority to lend to the Borrower any securities that are lent under this agreement.

    14.  <u>Transfer Taxes and Fees</u>.  All transfer taxes, transfer fees and costs related to letters of credit for the Borrowed Securities and Collateral shall be paid by the Borrower.

    15.  <u>Tax Treatment</u>.  The Borrower makes no representation whatsoever as to the tax treatment by Federal, state or local authorities as to the receipt of any income or profit inuring to the Lender as a result of the receipt of all loan premiums, dividends, interest and distributions by the Lender on the securities so loaned.

    16.  <u>Miscellaneous</u>.  This Agreement shall not be assignable by either party without the prior written consent of the other party.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the

benefit of the parties and their respective successors and assigns.  This Agreement may not be changed except by an instrument in writing signed by both of the parties.


IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.


By _____
    Joseph P. Martorella
    Kidder, Peabody & Co. Inc.
    (Authorized Signer)


THE NORTHERN TRUST COMPANY, as Trustee

By _Steven E. Cooler_

As its _Vice President_


-13-


TOTAL P.14

## TOLLING AGREEMENT

This Agreement, effective June 30, 2002 (hereinafter the "Agreement Date"), is made between the Northern Trust Company ("Northern"), in its own right and as fiduciary under various trusts and agency agreements, and Kidder, Peabody & Co., Inc. ("Kidder").

WHEREAS, at various times from January 1, 1991 through and including December 31, 1993 (the "Relevant Time") Northern, as fiduciary, loaned securities to Kidder pursuant to a Broker Loan Agreement dated September 8, 1981 (the "Agreement");

WHEREAS, Northern believes that it has various claims and causes of action against Kidder arising from or relating to transactions during the Relevant Time in which Northern, as fiduciary, loaned Capital Shares, issued by a closed-end mutual fund, Quest For Value Dual, to Kidder pursuant to the Agreement (the "Claims");

WHEREAS, Northern and Kidder wish to engage in discussions concerning the Claims to see if these matters can be resolved without litigation;

IT IS HEREBY AGREED by Northern and Kidder for valuable consideration, the sufficiency of which is hereby acknowledged:

1.    Northern shall not institute any legal or other proceedings against Kidder related to the Claims prior to December 31, 2002.

2.    Kidder agrees that any statute of limitation or statute of repose applicable to any Claims which have not expired as of the date of this Agreement, shall be tolled from and after the date of this Agreement until the earlier of 60 days after the date of the termination of this Agreement, or the date Northern institutes legal or other proceedings against Kidder related to the Claims.

3.    Kidder agrees that it cannot include the period of time tolled pursuant to paragraph 2 herein as part of any defense based upon any statute of limitations or equitable defense based upon laches.

CHI99 3936738-1.042044.0042



EXHIBIT

B

4.      This Agreement shall terminate on June 30, 2004.

5.      Kidder irrevocably acknowledges that it has received adequate consideration for this agreement, including Northern's agreement to refrain from instituting legal or other proceedings against Kidder as provided in this Agreement.

6.      This agreement may not be revoked, altered, modified or amended absent the written consent of Northern and Kidder or their respective counsel.

7.      This agreement may be executed in any number of counterparts, in either original or facsimile form, each of which will be deemed to be an original, and all of which when taken together will constitute a single instrument.

8.      This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

9.      The undersigned mutually warrant that they have the authority to execute this agreement on behalf of the respective parties.

10.     This agreement shall not be binding on any person or entity until signed by Northern and Kidder or their respective counsel.

11.     Except as specifically provided in paragraphs 1-3 herein, this Agreement shall not be deemed to constitute a waiver of any rights, claims, or defenses of the Parties or an admission or acknowledgement by Kidder of the validity or existence of any Claims.

12.     Neither this Agreement, nor any information regarding the substance or negotiation thereof, may be introduced into evidence in any action or proceeding, except for the purpose of countering any statute of limitations defense, or defense with similar import to a statute of limitations, raised by Kidder.

13.     The provisions of this Agreement are severable and, in the event that any court or any other adjudicator shall determine any one or more of the provisions hereof to be invalid,

-2-

illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement. This Agreement shall be construed and, if necessary reformed so as to be valid, legal and enforceable to the maximum extent possible.

14.     The parties agree that this Agreement shall be valid and binding based upon facsimile signatures.

Kidder, Peabody & Co., Inc.

Date: _20 June 2002_

By: _Peter C. Salerno_

Title: _Senior V.P. + Chief. Litigation Group_

The Northern Trust Company

Date: _____

By: _____

Title: _____

CHI99 3493092-1.042044.0042

CHI99 3936738-1.042044.0042

-3-

## AMENDMENT TO TOLLING AGREEMENT

This Amendment to Tolling Agreement ("Amendment"), effective August 2⁶, 2004, is made between the Northern Trust Company ("Northern"), in its own right and as fiduciary under various trusts and agency agreements, and Kidder, Peabody & Co., Inc. ("Kidder"). Capitalized terms used herein but not otherwise defined herein shall have the respective meanings assigned to such terms in the Tolling Agreement.

WHEREAS, Northern and Kidder are parties to a Tolling Agreement effective June 30, 2002 (the "Tolling Agreement");

WHEREAS, to allow the parties the opportunity to engage in discussions concerning the Claims to see if these matters can be resolved without litigation, Northern and Kidder have agreed to amend the Tolling Agreement to extend the termination date to June 30, 2005;

IT IS HEREBY AGREED by Northern and Kidder for valuable consideration, the sufficiency of which is hereby acknowledged:

1.      Paragraph 2 of the Tolling Agreement is hereby deleted in its entirety and the following language is hereby substituted therefor: "Kidder agrees that any statute of limitations or statute of repose applicable to any Claims which had not expired as of June 30, 2002 shall be tolled from and after June 30, 2002 until the earlier of 60 days after the date of the termination of this Agreement, or the date Northern institutes legal or other proceedings against Kidder related to the Claims."

2.      Paragraph 4 of the Tolling Agreement is hereby deleted in its entirety and the following language is hereby substituted therefor: "This Agreement shall terminate on June 30, 2005."

3. Upon the effectiveness of this Amendment, each reference in the Tolling Agreement to "this Agreement," "this agreement," or words of like import shall in each case mean and be a reference to the Tolling Agreement as amended by this Amendment.

4. Except as expressly set forth herein, all of the terms and provisions of the Tolling Agreement remain in full force and effect and are hereby ratified and confirmed in all respects.

5. This Amendment may not be revoked, altered, modified, or amended absent the written consent of Northern and Kidder or their respective counsel.

6. This Amendment may be executed in any number of counterparts, in either original or facsimile form, each of which will be deemed to be an original, and all of which when taken together will constitute a single instrument.

7. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

8. The undersigned mutually warrant that they have the authority to execute this Amendment on behalf of the respective parties.

9. This Amendment shall not be binding on any person or entity until signed by Northern and Kidder or their respective counsel.

10. The parties agree that this Agreement shall be valid and binding based upon facsimile signatures.

Kidder, Peabody & Co., Inc.

Date: 8/24/04

By: Gregory Wallace

Title:_____

-2-

The Northern Trust Company

Date: _August 26, 2004_    By: _____

Title: _Its Counsel_ _____

## AMENDMENT TO TOLLING AGREEMENT

This Amendment to Tolling Agreement ("Amendment"), effective July 29, 2005, is made between the Northern Trust Company ("Northern"), in its own right and as fiduciary under various trusts and agency agreements, and Kidder, Peabody & Co., Inc. ("Kidder"). Capitalized terms used herein but not otherwise defined herein shall have the respective meanings assigned to such terms in the Tolling Agreement.

WHEREAS, Northern and Kidder are parties to a Tolling Agreement effective June 30, 2002, as amended effective August 26, 2004 (the "Tolling Agreement");

WHEREAS, to allow the parties the opportunity to engage in discussions concerning the Claims to see if these matters can be resolved without further litigation, Northern and Kidder have agreed to amend the Tolling Agreement to extend the termination date to June 30, 2007;

IT IS HEREBY AGREED by Northern and Kidder for valuable consideration, the sufficiency of which is hereby acknowledged:

1.    Paragraph 2 of the Tolling Agreement, as amended, is hereby deleted in its entirety and the following language is hereby substituted therefor:

    (A)    Within 7 days after the effective date of this Amendment, Northern Trust shall dismiss without prejudice its complaint against Kidder in Case No. 05-3626 (N.D. Ill.).

    (B)    Kidder agrees that any statute of limitations or statute of repose applicable to any Claims which had not expired as of June 30, 2002 shall be tolled from and after June 30, 2002 until the earlier of 60 days after the date of the termination of this Agreement, or the date Northern re-institutes legal or other proceedings against Kidder related to the Claims following the above-referenced dismissal without prejudice (the "Tolling Period").

    (C)    Kidder agrees that Northern shall have the right to institute legal or other proceedings against Kidder related to the Claims before Kidder institutes such proceedings against Northern. Kidder shall not institute legal or other proceedings against Northern related to the Claims without first providing Northern 60 days' advance notice of Kidder's intention to institute

~6701725 DOC

proceedings.  After receiving such notice, Northern may immediately institute proceedings against Kidder related to the Claims.

(D)     Kidder reserves any rights it possesses to contest the jurisdiction and venue of any court or other authority in which Northern Trust institutes proceedings against Kidder related to the Claims or to assert a conflict of interest arising from or related to the representation of Northern Trust by Jenner & Block.

(E)     During the Tolling Period, the parties shall preserve documents and other information related to the Claims to the same extent as would be required if Northern did not dismiss its complaint against Kidder in Case No. 05-3626 (N.D. Ill.).

(F)     The parties agree to stipulate to the dismissal without prejudice of Case No. 05-3626. Kidder will not contend that this dismissal operates as an adjudication on the merits by reason of this dismissal constituting a second dismissal under Rule 41(a)(1), Federal Rules of Civil Procedure.

(G)     This agreement shall inure to the benefit of any subrogees or assignees of Northern including but not limited to the American Casualty Company of Reading, Pennsylvania.

2.     Paragraph 4 of the Tolling Agreement, as amended, is hereby deleted in its entirety and the following language is hereby substituted therefor: "This Agreement shall terminate on June 30, 2007."

3.     Upon the effectiveness of this Amendment, each reference in the Tolling Agreement to "this Agreement," "this agreement," or words of like import shall in each case mean and be a reference to the Tolling Agreement as amended by this Amendment.

4.     Except as expressly set forth herein, all of the terms and provisions of the Tolling Agreement remain in full force and effect and are hereby ratified and confirmed in all respects.

5.     This Amendment may not be revoked, altered, modified, or amended absent the written consent of Northern and Kidder or their respective counsel.

6.     This Amendment may be executed in any number of counterparts, in either original or facsimile form, each of which will be deemed to be an original, and all of which when taken together will constitute a single instrument.

7.     This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

8.     The undersigned mutually warrant that they have the authority to execute this Amendment on behalf of the respective parties.

9.     This Amendment shall not be binding on any person or entity until signed by Northern and Kidder or their respective counsel.

10.    The parties agree that this Agreement shall be valid and binding based upon facsimile signatures.

Kidder, Peabody & Co., Inc.

Date:  July 29, 2005

By: _____
Gregory J. Wallance
Kaye Scholer LLP
Counsel for Kidder, Peabody & Co., Inc.

The Northern Trust Company

Date: _____7/29/2005_____

By: _____

Title: _____Attorney_____

Jonah Orlofsky
LAW OFFICES OF JONAH ORLOFSKY
Counsel for The Northern Trust

## AMENDMENT TO TOLLING AGREEMENT

This Amendment to Tolling Agreement ("Amendment"), effective August 28, 2007, is made between the Northern Trust Company ("Northern"), in its own right and as fiduciary under various trust and agency agreements, and Kidder, Peabody & Co., Inc. ("Kidder"). Capitalized terms used herein but not otherwise defined herein shall have the respective meanings assigned to such terms in the Tolling Agreement.

WHEREAS, Northern and Kidder are parties to a Tolling Agreement effective June 20, 2002, as amended effective August 26, 2004, and again amended effective July 29, 2005 (the "Tolling Agreement");

WHEREAS, to allow the parties the opportunity to engage in discussions concerning the Claims to see if these matters can be resolved without litigation, Northern and Kidder has agreed to a second amendment to the Tolling Agreement to extend the termination date to August 31, 2008;

IT IS HEREBY AGREED by Northern and Kidder for valuable consideration, the sufficiency of which is hereby acknowledged:

1. Paragraph 2 of the Tolling Agreement, as amended, is hereby deleted in it entirety and the following language is hereby substituted therefore:

(A) Kidder agrees that any statute of limitations or statute of repose applicable to any Claims which had not expired as of June 30, 2002 shall be tolled from and after June 30, 2002 until the earlier of 60 days after the date of the termination of this Agreement, or the date Northern re-institutes legal or other proceedings against Kidder related to the Claims.

(B) Kidder agrees that Northern shall have the right to institute legal or other proceedings against Kidder related to the Claims before Kidder institutes such proceedings against Northern. Kidder shall not institute legal or other proceedings against Northern related to the Claims without first providing Northern 60 days' advance

notice of Kidder's intention to institute proceedings. After receiving such notice, Northern may immediately institute proceedings against Kidder related to the Claims.

(C)    Kidder reserves any rights it possesses to contest the jurisdiction and venue of any court or other authority in which Northern Trust institutes proceedings against Kidder related to the Claims or to assert a conflict of interest arising from or related to the representation of Northern Trust by Jenner & Block.

(D)    During the Tolling Period, the parties shall preserve documents and other information related to the Claims to the same extent as would be required if Northern had not dismissed its complaint against Kidder in Case No. 05-3626 (N.D. Ill.).

(E)    Kidder will not contend that the prior dismissal of Case No. 05-3626 operates as an adjudication on the merits by reason of that dismissal constituting a second dismissal under Rule 41(a)(1), Federal Rules of Civil Procedure.

(E)    This agreement shall inure to the benefit of any subrogees or assignees of Northern, including but not limited to the American Casualty Company of Reading, Pennsylvania.

2.     Paragraph 4 of the Tolling Agreement, as amended, is hereby deleted in its entirety and the following language is hereby substituted therefore: "This Agreement shall terminate on August 31, 2008."

3.     Upon the effectiveness of this Amendment, each reference in the Tolling Agreement to "this Agreement," "this agreement," or words of like important shall in each case mean and be a reference to the Tolling Agreement as amended by this Amendment.

4.     Except as expressly set forth herein, all of the terms and provision of the Tolling Agreement remain in full force and effect and are hereby ratified and confirmed in all respects.

2

5.      This Amendment may not be revoked, altered, modified, or amended absent the written consent of Northern and Kidder or their respective counsel.

6.      This Amendment may be executed in any number of counterparts, in either original or facsimile form, each of which will be deemed to be an original, and all of which when taken together will constitute a single instrument.

7.      This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

8.      The undersigned mutually warrant that they have the authority to execute this Amendment on behalf of the respective parties.

9.      This Amendment shall not be binding on any person or entity until signed by Northern and Kidder or their respective counsel.

10. The parties agree that this Agreement shall be valid and binding based upon facsimile and/or scanned signatures.

Kidder, Peabody & Co., Inc.

Date: 9/4/07

By: _____
Gregory J. Wallance
Kaye Scholer LLP
Counsel for Kidder, Peabody & Co., Inc.

The Northern Trust Company

Date: 9/4/07

By: _____
Jonah Orlofsky
Law Offices of Jonah Orlofsky
Counsel for The Northern Trust Company